UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

ANNETTE BROWN,

    Plaintiff,

– against –

STARRETT CITY ASSOCIATES, OFFICER NEWMAN, and JOHN DOES 1–5,

    Defendants.

MEMORANDUM AND ORDER

09-CV-3282

**JACK B. WEINSTEIN, Senior United States District Judge:**

Plaintiff Annette Brown sued Starrett City Associates ("SCA"), as well as a security officer, Robert Newman, and John Does it employed, on the following grounds: (1) false arrest under 42 U.S.C. § 1983 and New York law; (2) malicious prosecution under 42 U.S.C. § 1983 and New York law; (3) excessive force under 42 U.S.C. § 1983; (4) assault and battery under New York law; and (5) negligent hiring, supervision, training, and failure to discipline under New York law.

Plaintiff has failed to amend her complaint to identify any of the John Doe defendants; claims against unnamed defendants have been withdrawn. Plaintiff also has withdrawn her claims of malicious prosecution and negligent hiring, supervision, training, and discipline.

A jury trial is demanded. Defendants SCA and Newman move for summary judgment. For the following reasons, the motion is granted in part and denied in part.

**I.   Facts**

This case arises from the arrest of plaintiff Brown on July 30, 2008 by defendant Newman at Spring Creek Towers ("Towers"), a residential housing complex in Brooklyn



1

formerly known as Starrett City. At the time, Brown was forty-eight years old and lived in an apartment in the Towers, along with three foster children, several relatives, and the family of a friend. Brown Dep. 5, 27–30, 57, Apr. 6, 2010. Defendant SCA operates the Towers and its private security force, a Department of Public Safety (DPS). Def.'s Rule 56.1 Stmt. 2–3; Newman Dep. 8, Apr. 27, 2010. DPS is composed of security officers, employed by SCA, who carry weapons and handcuffs and have legal authority to make arrests and charge suspects with crimes. Def.'s Rule 56.1 Stmt. 2; Newman Dep. 17. Newman is a DPS officer. *Id.*

At 8:20 on the evening of Brown's arrest, Newman and a number of other officers, including Officer Joanne Phillips, responded to a call concerning a "disorderly group" in a public area at the complex. Newman Dep. 38, 41–42; Phillips Dep. 14, 17, Apr. 27, 2010. When they arrived at the scene, they encountered a group of fifteen to twenty-five teenagers surrounding a young man, Glen Harper, and a teenage girl, D.M., who were arguing. Newman Dep. 42; Phillips Dep. 17; Brown Dep. 45. At the time, Harper and his family were living in Brown's apartment. Brown Dep. 57. Newman alleged that he saw "a little bit of pushing and shoving" between D.M. and Harper. Newman Dep. 42. Phillips witnessed "[y]elling, fighting, [and] screaming." Phillips Dep. 19. She stated that D.M. and another young woman were fighting Harper, who was trying to escape, *id.*; D.M. was "cursing [and] swinging." *Id.* at 21. Brown was present but not involved in the fight between D.M. and Harper. Newman Dep. 42–43; Phillips Dep. 20.

Witnesses offer conflicting accounts of what happened next. The officers claim that they commanded the group to disperse and announced that those who failed to do so would be arrested. Newman Dep. 48–50; Phillips Dep. 21–22. Some left, but the argument continued. Newman Dep. 49; Phillips Dep. 22. On Newman's order, D.M. and Harper were arrested.

2

Phillips Dep. 22–23, 25. D.M. reportedly "scream[ed], yell[ed]," and tried to pull away as the officers attempted to handcuff her. *Id.* at 26.

The officers contend that Brown approached D.M. after she was handcuffed, grabbed the girl's upper arm, and tried to pull her away from the officers. Newman Dep. 51–52; Phillips Dep. 32–33 (describing Brown "charging" toward D.M. while Phillips was holding her). Brown allegedly cursed, screamed, and demanded that D.M. be released. Newman Dep. 54; Phillips Dep. 32, 41. Newman claims that he told Brown to let D.M. go but that she refused to do so. Newman Dep. 54–55. Newman then ordered that Brown be taken into custody; the officers handcuffed her and informed her that she was under arrest for disorderly conduct. Newman Dep. 56; Phillips Dep. 32.

Brown offers a very different account—essentially that she "touched" D.M. only to adjust the girl's shirt:

> I was walking on the walkway . . . when I heard [D.M.,] who called out to me and asked that I adjust her shirt.
> When I turned to see D.M., I noted that she was being held in custody by defendant Newman, who held her by the left arm, both hands cuffed behind her back, and walking towards my direction. D.M.'s shirt was pulled down, exposing her [breast], and she asked me . . . to fix her shirt.
> Defendant Newman and D.M. walked over to where I was standing. I touched D.M.'s shirt only, by pulling her shirt up. In so doing, I did not touch D.M. anywhere else nor did . . . I touch Defendant Newman. I did not interfere with Newman's arrest of D.M.
> At no time prior to my arrest did Officer Newman or any other officer give me an order to disperse, or any other order.
> . . .
> At no point prior to my arrest did I charge at D.M.
> At no point prior to my arrest . . . did I grab D.M. by the arm, or by any part of her body.
> At no point prior to my arrest did I try to pull D.M. away from Officer Newman or any officer.

> At no point prior to my arrest did I speak with Officer Newman or any other officer.

Brown Aff. 1–2, Mar. 28, 2011 (numeration omitted). *Accord* Brown Dep. 47–48, 53–54; D.M. Aff. 1, Apr. 4, 2011; Hendricks Aff. 1–2, Apr. 4, 2011.

Phillips testified that she did not recall seeing D.M.'s breast or undergarments exposed. Phillips Dep. 24.

Brown's account of the events, given in a deposition, reflects numerous inconsistencies. *Compare* Brown Dep. 47 (stating that when Brown first saw D.M. on the evening of June 30, 2008, the girl was already handcuffed and in Newman's custody), *with id.* at 56 (stating that when Brown entered the common area, she saw Newman "running to grab" D.M.); *compare id.* at 46 (stating that when Brown first saw D.M., she "wasn't nowhere near" the girl, who was "[o]n the opposite side of the sidewalk"), *with id.* at 47 (stating that when Brown first saw D.M. she was close enough to reach out and touch her); *compare id.* at 45, 47 (stating that when Brown arrived on the scene, she saw Harper on a bench and that D.M. was already in handcuffs when first she saw her), *with id.* at 51 (stating that Harper and D.M. were arrested "at the same time"); *compare id.* at 53 (stating that Newman was the only officer Brown saw before she was arrested), *with id.* at 52 (indicating that she saw Newman with three other officers before she was arrested).

Aubrey Hendricks, plaintiff's foster son, Brown Dep. 5, claims that Brown told the officers after her arrest that "she had bad wrists and to be careful with the handcuffs." Hendricks Aff. 2. Following her arrest, Brown was walked by the officers to a patrol car, driven to a nearby DPS station house, and seated in an office. Newman Dep. 58. Brown testified that during this period, she remained handcuffed for half an hour. Brown Dep. 62. She complained to Newman

4

and a supervisor that the cuffs were too tight. Brown Dep. 62. She alleges that Newman and the supervisor "didn't respond to what [she] was saying," but she concedes that Phillips released the left handcuff. *Id.* at 63. No evidence is offered indicating how much time elapsed between her complaint and the opening of the left handcuff.

Paramedics were called. Brown Dep. 65. Brown was released when they arrived. Brown Dep. 51, 64. Both her hands were swollen; the paramedics gave her an ice pack to treat the swelling. Hendricks Aff. 2.

Plaintiff was given a desk appearance ticket for disorderly conduct, with a court date some two months later. Brown Dep. 64–65. The citation was prepared by Officer Lang, also present at the scene. Phillips Dep. 17, 39. It stated, "Deft. attempted to cause public alarm in public place and refused to comply with a lawful order by refusing to disperse by making obscene gesture." Def.'s Am. Mot. Summ. J. Ex. G 2 (criminal citation for Annette Brown, July 30, 2008).

After plaintiff's release from the DPS station, she was treated at Kings County Hospital Center, being admitted the day of the arrest and treated the next day. Pl.'s Opp. Summ. J. Ex. 4 9 ("Kings County Records"). *But see* Phillips Dep. 51 (stating that Brown declined an offer to be taken to a hospital). Paperwork prepared by a nurse reported that Brown was under mild distress and indicated tenderness, pain, and swelling in the hands. Kings County Records 7. A physician reported a possible contusion, *id.* at 10, and that Brown reported "severe" pain in the hands. *Id.* at 9. No swelling or tenderness was reported by the doctor. *Id.* at 9. Brown was given an injection of ketorolac tromethamine, a pain medication, and a prescription for ibuprofen. *Id.* at 3, 12.

On July 21, 2010, Brown underwent hand surgery for carpal tunnel syndrome at Brookdale Hospital in Brooklyn. Pl.'s Opp. Summ. J. Ex. 5 1 (report of medical examination by Paul Kleinman, M.D.). She offers a medical report provided by a physician, not her own, based on a physical examination and a review of medical records. *Id.* The report, dated August 30, 2010, states that Brown's "bilateral carpal tunnel syndrome was preexisting" but that "it could have been exacerbated on the right [side] by the incident on 7/30/2008." *Id.* at 3.

Without a trial, Brown's disorderly conduct charge was dismissed on April 9, 2009. Pl.'s Opp. Summ. J. Ex. 6 (Criminal Court of the City of New York Cert. of Disposition No. 24567). Brown stated that no officer attended a hearing regarding the charge. Brown Dep. 83.

## II. Law

### A. Summary Judgment

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986); *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 84 (2d Cir. 2004). Dismissal is warranted when, after construing the evidence in the light most favorable to the nonmoving party and drawing all reasonable inferences in its favor, there is no genuine issue as to any material fact. Fed. R. Civ. P. 56(a); *see Anderson*, 477 U.S. at 247–50, 255; *Sledge v. Kooi*, 556 F.3d 137, 140 (2d Cir. 2009).

The burden rests on the moving party to demonstrate the absence of a genuine dispute of any material fact. *Celotex v. Catrett*, 477 U.S. 317, 323 (1986); *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995). If the moving party appears to meet this burden, the opposing party must produce evidence that raises a material question of fact to defeat the motion. *See* Fed. R. Civ. P. 56(e). "Mere conclusory allegations, speculation, or conjecture"

will not suffice. *Cifarelli v. Vill. of Babylon*, 93 F.3d 47, 51 (2d Cir. 1996); see also *Delaware & Hudson Ry. v. Consol. Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990).

**B.     False Arrest**

Under New York law, a person is falsely arrested if: "'(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged.'" *Curry v. City of Syracuse*, 316 F.3d 324, 335 (2d Cir. 2003) (quoting *Weyant v. Okst*, 101 F.3d 845, 853 (2d Cir. 1996)). The elements of a false arrest claim under 42 U.S.C. § 1983 are substantially the same. *Jenkins v. City of New York*, 478 F.3d 76, 84 (2d Cir. 2007). *Accord Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995).

Probable cause to arrest is a complete defense to a false arrest claim, whether brought under state law or Section 1983. *Jenkins*, 478 F.3d at 83 (quoting *Weyant*, 101 F.3d at 852). *See also Virginia v. Moore*, 553 U.S. 164, 171 (2008) ("In a long line of cases, [the Supreme Court has] said that when an officer has probable cause to believe a person committed even a minor crime in his presence, the balancing of private and public interests is not in doubt. The arrest is constitutionally reasonable.").

**C.     Excessive Force; Assault and Battery**

Excessive force claims brought under Section 1983 require that force be exerted under the color of state law. *Humphrey v. Landers*, 344 Fed. Appx. 686, 688 (2d Cir. 2009) (citing *Posr v. Doherty*, 944 F.2d 91, 94-95 (2d Cir. 1991)). Otherwise, an excessive force claim under Section 1983 is "'substantially identical'" to an assault and battery claim under New York law. *Id.* Under New York law, "[a]n 'assault' is an intentional placing of another person in fear of imminent harmful or offensive contact. A 'battery' is an intentional wrongful physical contact

7

with another person without consent." *United Nat'l Ins. Co. v. Waterfront N.Y. Realty Corp.*, 994 F.2d 105, 108 (2d Cir. 1993) (citing, *inter alia, Hernandez v. Lattimore*, 612 F.2d 61, 67 (2d Cir. 1979)). "[W]here there has been a lawful arrest, intentional contact with the arrested person does not constitute assault and battery, provided [the] force is reasonable." *Cunningham v. United States*, 472 F. Supp. 2d 366 (E.D.N.Y. 2007) (citing *Lorensen v. State*, 249 A.D.2d 762 (3d Dep't 1998); *Wyllie v. Dist. Atty., Cnty. of Kings*, 2 A.D.3d 714 (2d Dep't 1996)).

Reasonability of force exerted in handcuffing an arrestee is determined by the circumstances.

> [T]he right to make an arrest accompanies with it the right to use some degree of physical coercion. Frequently, a reasonable arrest involves handcuffing the suspect, and to be effective handcuffs must be tight enough to prevent the arrestee's hands from slipping out. Placing handcuffs on an arrestee tight enough to cause nerve damage may, however, constitute excessive force in violation of the Fourth Amendment. The reasonableness of the handcuffing of an arrestee must be determined in light of the minimal amount of force necessary to maintain custody. . . . In addition, in evaluating the reasonableness of handcuffing, a Court is to consider evidence that: 1) the handcuffs were unreasonably tight; 2) the defendants ignored the arrestee's pleas that the handcuffs were too tight; and 3) the degree of injury to the wrists.

*Esmont v. City of New York*, 371 F. Supp. 2d 202, 214–15 (E.D.N.Y. 2005).

### D. Disorderly Conduct and Obstruction

A person is guilty of disorderly conduct under New York when, "in a public place, [she] uses abusive or obscene language, or makes an obscene gesture"; "congregates with other persons in a public place and refuses to comply with a lawful order of the police to disperse"; or "creates a hazardous . . . condition by any act which serves no legitimate purpose." N.Y.P.L. § 240.20.

The essence of disorderly conduct is "conduct which involves an intent or risk that a breach of the peace will occur." *People v. Delhall*, 131 A.D.2d 870, 870 (2d Dep't 1987) (citing,

8

*inter alia, People v. Bakolas*, 59 N.Y.2d 51, 54 (N.Y. 1983)). "In determining whether probable cause exists to arrest a person for disorderly conduct . . . the circumstances must indicate that the arresting officer was 'justified in concluding that [the] defendant was intentionally or recklessly creating a substantial risk that public inconvenience, annoyance or alarm would occur[.]'" *Delhall*, 131 A.D.2d at 870 (citing N.Y.P.L. § 240.20; *People v. Shapiro*, 96 A.D.2d 626, 627 (3d Dep't 1983)).

Related in this case is the crime of obstruction of government administration in the second degree, defined as "intentionally obstruct[ing], impair[ing] or obstruct[ing] . . . the administration of law . . . or attempt[ing] to prevent a public servant from performing an official function, by means of . . . physical force or interference, or by means of any independently unlawful act[.]" N.Y.P. L. § 195.05.

### E. Corporate Liability under Section 1983

When a private corporation operates a private police force, it is subject to liability under 42 U.S.C. § 1983 as if it were a municipality. *See Rodriguez v. Smithfield Packing Co., Inc.*, 338 F.3d 348 (4th Cir. 2003). Under Section 1983, such an entity can be held liable for tortious acts of its employees performed in accordance with official policies and established customs. *Williams v. City of White Plains*, 718 F. Supp. 2d 374, 381 (S.D.N.Y. 2010) (citing *Monell v. Dep't of Social Servs. of the City of New York*, 436 U.S. 658, 690 (1978). Section 1983 does not provide for vicarious liability for employees' torts. *Williams*, 718 F. Supp. 2d at 381 (citing *Monell*, 436 U.S. at 691).

### F. Vicarious Liability

Under New York law, defendants may be liable for "common law torts, like false arrest and malicious prosecution, committed by their employees under the doctrine of *respondeat*

*superior.*" *L.B. v. Town of Chester*, 232 F. Supp. 2d 227, 239 (S.D.N.Y. 2002). Under that doctrine, employers are vicariously liable for intentional torts committed "in furtherance of the employer's business and within the scope of employment." *N.X. v. Cabrini Med. Ctr.*, 765 N.E.2d 844, 847 (N.Y. 2002) (citing *Riviello v. Waldron*, 391 N.E.2d 1278 (N.Y. 1979)).

### III. Application of Law to Facts

#### A. False Arrest

Material facts concerning the arrest of the plaintiff are in dispute. Taking the available evidence in the light most favorable to the non-moving party, the only fact supporting probable cause is that Brown made some physical contact with the body or clothing of a handcuffed arrestee, D.M. This fact alone, if established, does not support a finding that the officers had probable cause to believe that Brown was engaging in disorderly conduct, obstruction of a lawful arrest, or any other crime.

Answers to the relevant questions—whether Brown defied a lawful order to disperse, whether she approached the officers, whether she shouted and cursed, and whether she attempted to pull D.M. away—depend on whose testimony is credited and on how inconsistencies within Brown's account of the events are perceived. Given the lack of clarity as to the facts, summary judgment is not warranted as to plaintiff's false arrest claim.

#### B. Excessive Force; Assault and Battery

Sufficient conflicting evidence exists from which a jury could reasonably find that Newman used excessive force in handcuffing plaintiff, in violation of 42 U.S.C. § 1983. Such a finding might be sustained based on the allegations that (1) Newman knew Brown had "bad wrists," (2) the handcuffs were excessively tight, (3) Newman ignored her complaints, (4) she was handcuffed for two hours, and (5) she was injured as a result.

10

These facts, if shown, would also substantiate a claim for assault and battery under New York law.

### C. Corporate Liability under Section 1983

Plaintiff points to no evidence indicating that any allegedly tortious act in this case was committed in accordance with an established policy or custom of SCA. Accordingly, no claims may go forward against SCA under Section 1983. A claim for excessive force may go forward against Newman individually, as stated above.

### D. Vicarious Liability

SCA may be vicariously liable for the common law torts of false arrest or assault and battery. It would need to be shown that the torts were committed by Newman in furtherance of SCA's interests and within the scope of his employment. Claims against SCA for these state law claims may therefore proceed.

## IV. Conclusion

The motion to dismiss is granted with respect to plaintiff's claims against SCA under 42 U.S.C. § 1983 for excessive force. It is denied as to all remaining claims.

Trial shall be expedited.

SO ORDERED.

Jack B. Weinstein
Senior United States District Judge

Date: May 13, 2011
Brooklyn, New York

11